**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

ADAM DANIEL NAGEL,

        Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

CASE NO. 1:21-cv-01964

MAGISTRATE JUDGE AMANDA M. KNAPP

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Adam Daniel Nagel ("Plaintiff" or "Mr. Nagel") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and is before the undersigned pursuant to the consent of the parties. (ECF Doc. 12.) For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

**I.**      **Procedural History**

Mr. Nagel filed his applications for DIB and SSI on March 25, 2019. (Tr. 15, 203-11, 212-18.) He asserted a disability onset date of November 30, 2012. (*Id*.) He alleged disability due to major depressive disorder, generalized anxiety disorder, right-sided spastic hemiparesis, and gait abnormality. (Tr. 68, 97, 145, 153, 229.) His applications were denied at the initial

1

level and upon reconsideration (Tr. 15, 145-50, 153-57).  A telephonic hearing was held before

an Administrative Law Judge ("ALJ") on October 14, 2020 (Tr. 30-67).

The ALJ issued an unfavorable decision on November 24, 2020, finding Mr. Nagel had

not been under a disability from November 30, 2012 through the date of the decision.  (Tr. 12-

29.)  The Appeals Council denied Mr. Nagel's request for review on September 22, 2021 (Tr.

200-02), making the ALJ's decision the final decision of the Commissioner (Tr. 1-6).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Mr. Nagel was born in 1981.  (Tr. 203, 212, 225.)  He was convicted of receipt of child

pornography in May 2008 and designated a sexually oriented offender.  (Tr. 204, 227.)  He

worked at a nursing home before his incarceration, preparing and delivering trays to residents

and washing dishes.  (Tr. 23, 39-41, 204, 230, 231.)  He obtained his GED in 2010.  (Tr. 230.)

He was released from custody on July 22, 2016, but remained incarcerated or in a halfway house

until 2017.  (Tr. 42, 227.)

### B.     Medical Evidence

#### 1.     Treatment History

##### i.     Physical Impairments

Mr. Nagel has a history of progressive right hemiparesis with spasticity since his late

twenties, with unclear etiology.  (Tr. 840, 1061, 1166.)  A brain MRI performed on April 13,

2017 due to right-sided weakness showed left cerebral gliosis and atrophy compatible with the

sequela of encephalitis / Rasmussen encephalitis.  (Tr. 877-78.)  On May 16, 2017, Mr. Nagel

presented to the Mellen Center for Multiple Sclerosis at the Cleveland Clinic for evaluation.  (Tr.

840-43.)  He saw Alexander D. Rae-Grant, M.D.  (*Id*.)  Dr. Rae-Grant observed that imagining

2

demonstrated "very focal and lateralized atrophy and white matter change, no enhancement, chronic atrophy." (Tr. 840.)  Mr. Nagel's physical examination findings included prominent right hemiparesis with circumduction of the leg and flexed arm. (Tr. 841.)  His motor examination showed mild pronator drift with normal strength in the left extremities and strength ranging from 4/5 to 5/5 in the right extremities. (Tr. 841-42.)  There was slow fine movement in the right hand and foot. (Tr. 842.)  Patellar and Achilles reflexes were diminished on the right. (*Id*.)  Mr. Nagel had a right hemiparetic gait. (*Id*.)  His sensation was intact. (*Id*.)  Dr. Rae-Grant indicated that Mr. Nagel's chronic history did "not suggest an autoimmune encephalitis or active vasculitis, or a vascular causation for [his] problem." (Tr. 842.)  Dr. Rae-Grant also indicated Mr. Nagel did not have MS, but thought he might have a "perinatal injury which was subclinical" and "decompensating." (*Id*.)  Dr. Rae-Grant ordered testing, including an EEG. (Tr. 842-43.)  Mr. Nagel's June 7, 2017 EEG study was within normal limits, with no epileptiform discharges or EEG seizures recorded. (Tr. 866.)

Mr. Nagel continued to follow with the Mellen Center in 2017 and throughout 2018. (Tr. 746, 749, 757.)  He received Botox injections to treat his stiffness, spasms, and pain. (Tr. 748, 749, 757.)  His Botox therapy was reported to be helpful at times (Tr. 749, 757) and unhelpful at other times (Tr. 746, 748).

Mr. Nagel returned to Cleveland Clinic's Mellen Center on February 21, 2018. (Tr. 757-59.)  He saw Robert A. Bermel, M.D. and Hilary Young, PA-C. (*Id*.)  He was following with physical therapy and the spasticity group for Botox injections. (Tr. 757.)  He planned on receiving a new right AFO (ankle foot orthosis). (*Id*.)  He reported temporary improvement from his last injection, and denied new or worsening symptoms. (*Id*.)  On examination, his muscle strength was normal in both upper extremities, normal in the left lower extremity, and ranged

3

from 4/5 to 5/5 in his right lower extremity.  (Tr. 758.)  Coordination in his upper extremities was normal.  (*Id*.)  His standing balance was impaired, and his gait was spastic/hemiparetic on the right.  (*Id*.)  He was not using an assistive device.  (*Id*.)  Mr. Nagel was advised to have a repeat brain MRI and repeat EEG.  (Tr. 758-59.)

An April 11, 2018 brain MRI showed stable left frontal gliosis with secondary changes, no changes in the remainder of the brain, and no evidence of acute intracranial abnormality.  (Tr. 858-60.)  Mr. Nagel had another normal EEG on August 10, 2018.  (Tr. 857.)

Mr. Nagel returned to Dr. Rae-Grant and PA Young on September 13, 2018.  (Tr. 746-48.)  He ambulated without an assistive device during his visit.  (Tr. 748.)  On examination, his standing was impaired, and his gait was spastic/hemiparetic on the right.  (Tr. 748.)  He was diagnosed with chronic focal encephalomalcia with progressive spastic right hemiparesis and severe spasticity of unknown etiology.  (*Id*.)  He planned to resume physical therapy and had received Botox injections every three months, but reported that his most recent injections had not helped, even with an increase in the dose.  (Tr. 746, 748.)  He denied new or worsening symptoms.  (Tr. 748.)  PA Young reviewed the recent April 2018 brain MRI, and noted that it appeared stable compared to previous imagery.  (*Id*.)  She also reviewed the August 2018 EEG, and noted that it was "within normal limits without evidence of seizure activity."  (*Id*.)  Mr. Nagel was advised to continue treatment for spasticity.  (*Id*.)

On September 18, 2018, after a six month break in treatment, Mr. Nagel returned to the Cleveland Clinic for physical therapy relating to his gait, balance, and functional mobility.  (Tr. 744.)  He reported that he continued to be limited when rising from a chair, walking in his house and community, negotiating stairs, heavy exertion, and physical and recreational activities.  (*Id*.)  Objective testing showed that he could stand from a seated position without using his hands,

4

could stabilize independently, and could sit from a standing position with minimal use of his hands. (Tr. 745.) A functional gait assessment showed that his gait was normal or mildly impaired. (*Id*.) High-Intensity Interval Training exercises were recommended. (Tr. 745-46.)

Mr. Nagel returned to the Cleveland Clinic for follow-up on January 4, 2019, seeing Keith McKee, M.D. (Tr. 737-39.) He reported no changes following another round of Botox injections on October 23, 2018, with continued stiffness in his right leg and occasional spasms. (Tr. 737-38.) He reported that he performed stretching exercises five days a week and was last evaluated by physical therapy in September 2018. (*Id*.) He planned to schedule an occupational therapy appointment for his right arm stiffness. (*Id*.) His strength was diminished (3+) in his right ankle dorsiflexors and plantarflexors, but was otherwise normal in his bilateral extremities. (*Id*.) Other examination findings included decreased fine movements in the right hand, spasticity in the right extremities, and a spastic and hemiparetic gait on the right. (Tr. 738-39.) Sensation was intact. (Tr. 739.) Dr. McKee recommended that Mr. Nagel continue with Botox injections, increase Baclofen, and proceed with occupational therapy. (*Id*.)

Mr. Nagel returned to Dr. McKee on March 26, 2019. (Tr. 731.) He complained of stiffness in his right elbow flexor and thumb. (*Id*.) He was interested in an injection in his right arm muscles. (*Id*.) He reported stretching at least twice each week and that he planned to continue with occupational therapy following Botox injections. (*Id*.) His gait was still spastic/hemiparetic on the right. (Tr. 732.) Dr. McKee administered a Botox injection in the right upper extremity. (Tr. 733.) Mr. Nagel was advised to perform stretching exercises multiple times each day and to resume occupational therapy. (*Id*.)

During an August 22, 2019 physical therapy session, Mr. Nagel reported using an AFO for mobility, requiring adaptations to environment for mobility, having limited support at home,

5

and having transportation and accessibility barriers.  (Tr. 1018.)  Examination showed decreased strength, range of motion, flexibility, and balance, and a gait abnormality.  (Tr. 1018-19.)  He was instructed on proper exercise technique and advised to return to the orthotist to have his AFO more properly fitted.  (Tr. 1021.)

Mr. Nagel returned to Cleveland Clinic's Mellen Center for follow up with PA Young and Dr. Rae-Grant on February 26, 2020.  (Tr. 1051-58.)  He reported decreased hand function, including being unable to hold onto to things, especially with the right hand.  (Tr. 1051.)  He also reported that his ability to ambulate had worsened such that he could not walk as well without his brace, his foot was turning in more without his brace, he was unable to bend/move his toes, he fell once, and he lacked stability when getting up from a seated position.  (*Id*.)  He had stopped Botox injections because they did not "really do much."  (*Id*.)  He also stopped taking tizanidine because nothing tasted right when he was taking it.  (*Id*.)  He was still taking Baclofen with some reported benefit.  (*Id*.)  On examination, his muscle strength was 4/5 in the right dorsiflexor and 4-/5 in the right ankle plantarflexor, but otherwise normal in the bilateral extremities.  (Tr. 1054.)  Spasticity was observed in the right hand and leg.  (*Id*.)  Mr. Nagel's upper extremity coordination was impaired on the right due to spasticity.  (*Id*.)  His standing balance was impaired and his gait was spastic/hemiparetic on the right and unsteady.  (*Id*.)  He ambulated independently, but with an AFO brace on the right.  (*Id*.)  A neurosurgery evaluation, additional testing, and repeat brain MRI and EEG were recommended to address Mr. Nagel's worsening symptoms over the prior three or four months.  (*Id*.)

Mr. Nagel saw Cleveland Clinic neurologist Sumit B. Parikh, M,D. on March 3, 2020 for a consultation and evaluation of the abnormal white matter noted on his neuroimaging.  (Tr. 1061.)  A motor examination showed increased tone in the right upper and lower extremities,

6

spasticity, impaired fine finger movements in the right upper and lower extremities, and dystonia of the left thumb. (Tr. 1064.) He demonstrated no abnormal movements or tremor and no drift of the upper or lower extremities, with active resistance in all extremities. (*Id*.) Mr. Nagel could rise from a seated position and get onto his toes and heels with only a little difficulty. (*Id*.) His reflexes were normal in the left extremities and 3+ in the right extremities, and his sensation was normal to touch bilaterally. (*Id*.) His gait was hemiparetic with no ataxia. (*Id*.) Dr. Parikh's impression was: "Progressive left FP white matter abnormality with associated atrophy; systemic cortical atrophy . . . leading to adult-onset . . . slow-progressive right sided hemiplegia - unclear etiology." (*Id*.) Dr. Parikh recommended proceeding with the repeat brain MRI as planned and recommended additional testing and a neuro-ophtho consult. (Tr. 1065.) Mr. Nagel had a repeat brain MRI on March 6, 2020. (Tr. 1059-60.) It showed "[u]nchanged left cerebral gliosis and atrophy . . . compatible with the sequela of encephalitis," with was no acute, new, or progressive intracranial pathology or abnormal enhancement. (Tr. 1060.)

Mr. Nagel returned to Dr. McKee on March 20, 2020, reporting worsening symptoms of spasticity, stiffness, difficulty walking, and inability to grab objects. (Tr. 1086.) Examination showed decreased strength on the right. (Tr. 1088-89.) His gait was spastic and hemiparetic on the right with minimal knee flexion. (Tr. 1089.) Fine movements were decreased in the right hand. (*Id*.) Sensation was intact. (*Id*.) Dr. McKee increased Mr. Nagel's Baclofen dose and noted they would consider a trial of gabapentin since tizanidine was not tolerated. (Tr. 1090.) Dr. McKee also recommended that Mr. Nagel continue with Botox injections. (*Id*.) Mr. Nagel wanted to first try oral antispasticity medications. (*Id*.) Mr. Nagel was provided a prescription for a disability parking placard. (*Id*.)

On April 10, 2020, Mr. Nagel presented to Aaron Nicka, OTR/L at the Cleveland Clinic for occupational therapy.  (Tr. 1112.)  He demonstrated difficulty with upper extremity extension with thumb positioning.  (*Id.*)  He was instructed to continue to work on home management tasks and functional home exercise routine.  (*Id.*)

Mr. Nagel returned for physical therapy and occupational therapy on May 1, 2020.  (Tr. 1122, 1128.)  He reported continued difficulty with rising from a chair, walking in the community, stair negotiation, bending, heavy exertion, physical activities, recreational activities, and upper extremity movement and dynamic movement.  (Tr. 1122, 1128.)  He also reported receiving Botox injections the day before.  (Tr. 1122, 1123.)  On examination, he demonstrated severe limitation in dorsiflexion flexibility in the right ankle and ankle eversion.  (Tr. 1124.)  He was instructed on therapeutic exercises, gait training, and manual skills to improve joint mobility, range of motion, and decrease pain.  (Tr. 1125, 1130.)

##### ii.    Mental Health Impairments

Mr. Nagel received treatment for depression while he was incarcerated.  (*See generally* Tr. 282-602.)  He continued to receive mental health treatment after his release from prison at Signature Health.  (Tr. 923-994, 1212-1448.)  He presented to Alexander D'Rain, LSW at Signature Health for an Adult Behavioral Health Assessment on May 24, 2018, which was mandated by the U.S. Federal Probation Department.  (Tr. 923-32.)  On examination, Mr. Nagel presented as guarded and mistrustful, and appeared confused.  (Tr. 929.)

Mr. Nagel presented to Leighanna Stephenson, CNP[1] at Signature Health on November 6, 2018 for an Adult Initial Psychiatric Evaluation.  (Tr. 933-37.)  He reported attempting suicide

---

[1] Nurse Stephenson is also listed in the records as an APN.  (Tr. 987.)

in the past, with a recent attempt by overdose in September 2018 and prior attempts in prison.
(Tr. 933.)  He did not seek emergency treatment for the September 2018 attempt.  (*Id*.)  His
mental status examination findings included: suicidal ideation/thought; normal appearance,
demeanor, activity, speech, perception, and cognition; oriented x 4; avoidant eye contact; logical
thought process; normal but guarded thought content; anxious and depressed mood; full affect;
cooperative behavior; average intellect; and fair insight and judgment.  (Tr. 934-35.)  He was
diagnosed with major depressive disorder, recurrent, moderate, and generalized anxiety disorder.
(Tr. 936.)  He was prescribed trazadone, citalopram, and bupropion HCL.  (Tr. 935.)

Mr. Nagel attended counseling sessions with LSW D'Rain and/or LISW Holly
Butterfield at Signature Health in 2018 and 2019.  (Tr. 938-978.)  During that time, he reported
he was also attending group therapy and individual counseling relating to his sex offense.  (Tr.
939.)  He reported suicidal ideation when he thought of his father who had passed away four
years earlier.  (Tr. 941, 943.)  He reported that he struggled with isolation (Tr. 941, 944, 946),
but spent time with his mother and aunts (Tr. 951, 961, 966).  He said he spent time at his
mother's house watching television to avoid being alone (Tr. 946), but that his relationship with
his mother was strained at times (Tr. 961, 966, 981).  He wrote poetry as a way to process his
emotions, but also reported having to scale back on his writing at times because his writing could
be too "dark" and caused his feelings to become overwhelming.  (Tr. 946, 951, 976, 981.)

Mr. Nagel was admitted to a Partial Hospitalization Program ("PHP") at Highland
Springs Hospital on February 7, 2019 after he presented as a walk-in seeking management of
severe depression.  (Tr. 605-728.)  He was released from jail on February 5, 2019, where he had
been held for violating terms of his probation.  (Tr. 608.)  He reported a difficult time readjusting
to normal life, no friends, isolation, being withdrawn, and fleeting suicidal thoughts.  (*Id*.)  He

9

also reported a depressed mood, anhedonia, feelings of hopelessness, decreased motivation, decreased appetite, and impaired sleep. (*Id.*) He said he was not close with his mother or brother, and that his aunt was his primary support system. (*Id.*) During his admission, Wellbutrin and Celexa were discontinued. (Tr. 605.) His symptoms stabilized and he was discharged on February 27, 2019. (*Id.*) At discharge, he was well-groomed; his mood was mildly anxious and depressed but improving; his affect was full; he was alert and oriented x 4 and his thought process was logical, organized, and goal-oriented; he denied suicidal or homicidal ideation and exhibited no signs of psychosis of mania; and his judgment and insight were fair but improving. (Tr. 606.) His discharge diagnosis was mood disorder, not otherwise specified, with a note to rule out bipolar II, mixed, severe, without psychotic features. (*Id.*) He was prescribed Abilify for mood and trazadone for sleep. (*Id.*)

During a counseling session with LISW Butterfield on March 4, 2019, he reported that his mood was more stable, with less depression and no suicidal thoughts. (Tr. 951.) He was well-groomed, cooperative, and friendly. (Tr. 948.) He made good eye contact and his speech was normal and spontaneous. (*Id.*) His mood was anxious but with an appropriate affect. (*Id.*) He also reported a history of visual hallucinations since he was a teenager that had decreased since starting on Abilify. (*Id.*)

Mr. Nagel returned to CNP Stephenson for a psychiatric follow up on March 11, 2019. (Tr. 982-87.) He denied current hallucinations and reported that his depression was present but improved. (Tr. 986-87.) He exhibited better eye contact and was more engaged than previously. (Tr. 984.). His attention, judgment and insight were fair. (Tr. 984-85.) His mood and affect were described as euthymic, bright, and mood congruent. (Tr. 984.) His speech was normal, his language was appropriate, his thought process was linear and goal directed, his associations were

10

reality based and cohesive, and there were no delusions or hallucinations.  (Tr. 984-85.)  His fund of knowledge was average and his memory was intact.  (Tr. 985.)  His primary diagnosis was changed to major depressive disorder, recurrent with psychotic features due to the presence of hallucinations.  (Tr. 987.)  He was instructed to continue with Abilify and trazadone.  (*Id*.)

Mr. Nagel returned to CNP Stephenson on April 23, 2019.  (Tr. 988-93.)  He reported low energy, low motivation, and periodic thoughts of death, but no active plan or intent.  (Tr. 992.)  Mental status examination findings were similar to the findings from the March appointment, except he reported sporadic, non-command audio hallucinations.  (*Compare* Tr. 990-91 *with* Tr. 984-85.)  He reported that trazadone was not helping with his sleep.  (Tr. 993.)  CNP Stephenson discontinued trazadone, continued Abilify, added Prozac for depression, and added doxepin for sleep.  (*Id*.)  When he saw LISW Butterfield on April 29, 2019, Mr. Nagel was well-groomed, cooperative, and friendly.  (Tr. 1214.)  He made good eye contact and his speech was normal and spontaneous.  (Tr. 1214-15.)  His mood was depressed but his affect was appropriate.  (Tr. 1215.)  He reported that his symptoms increased when he had little to do, but he was reluctant to add more structure to his schedule.  (Tr. 1218.)  LISW Butterfield discussed with him the importance of monitoring for symptom escalation.  (*Id*.)

When he returned to LISW Butterfield on May 6, 2019, Mr. Nagel presented with a depressed mood and congruent affect.  (Tr. 1223.)  He reported an increase in symptoms and suicidal ideation.  (*Id*.)  He was encouraged to return to the PHP at Highland Springs.  (*Id*.)

Mr. Nagel was admitted the PHP at Highland Springs Hospital on May 13, 2019.  (Tr. 1602-1748.)  He presented seeking further treatment for severe, recurrent depression with suicidal ideation.  (Tr. 1602.)  Before agreeing to adjust his medications, he wanted to see whether therapy would help.  (*Id*.)  His symptoms remained at moderate levels as he progressed

11

with treatment. (*Id*.)  He reported decreased appetite and impaired sleep. (*Id*.)  His Prozac and doxepin were increased. (*Id*.)  He was engaged in group therapy and learned strategies to address and improve his symptoms. (*Id*.)  When he was discharged on May 31, 2019, he denied depression and anxiety and reported that he was sleeping better. (*Id*.)  At discharge, he was well-groomed, euthymic, and his affect was full. (*Id*.)  He was alert and oriented x 4, his speech was within normal limits, his thought process was logical and organized, he denied suicidal or homicidal ideation, he showed no symptoms of psychosis or mania, and his judgment and insight were improving. (Tr. 1602-03.)  His diagnoses were: major depressive disorder, recurrent, severe, without psychotic features; and anxiety disorder, not otherwise specified. (Tr. 1603.)  His discharge medications included Baclofen for muscle relaxing, Abilify and Prozac for mood, and doxepin for sleep. (*Id*.)

After his second discharge from the PHP at Highland Springs, Mr. Nagel continued to see LISW Butterfield for counseling from June 2019 through at least September 2020, approximately twice each month. (Tr. 1225-1403.)  He also attended psychiatric follow up appointments with CNP Stephenson and Anna Whitmer, APN at Signature Health on a fairly regular basis, from June 2019 through at least July 2020. (Tr. 1404-49.)

At a psychiatric follow-up with CNP Stephenson on June 18, 2019, Mr. Nagel reported that his new cat had helped improve his mood and that he was socializing more with his cousin. (Tr. 1409.)  His last suicidal ideation was before his most recent PHP admission. (*Id*.)  He was trying to communicate with his probation officer to get permission to fill out job applications online since the terms of his probation precluded him from accessing the internet. (*Id*.)  On examination, he exhibited better eye contact and was more engaged. (Tr. 1407.)  His attention and concentration and judgment and insight were fair. (*Id*.)  His mood and affect were euthymic,

12

bright, and mood congruent.  (*Id*.)  His speech was normal, his language was appropriate, his thought process was linear and goal directed, his associations were reality based and cohesive, and he demonstrated no delusions.  (*Id*.)  His fund of knowledge was average and his memory was intact.  (*Id*.)  Sporadic non-command auditory hallucinations were noted (*id*.), but he reported that Abilify had "stopped" his auditory hallucinations (Tr. 1409)  He was diagnosed with: major depressive disorder, recurrent, severe with psychotic features; and generalized anxiety disorder.  (Tr. 1408.)  CNP Stephenson directed him to continue taking Abilify and increased his Prozac and doxepin doses.  (Tr. 1409.)

Mr. Nagel returned for psychiatric follow up on August 2, 2019.  (Tr. 1411.)  He saw APN Whitmer.  (*Id*.)  He reported sleeping a lot, being bored, worrying a lot, lacking focus and concentration, and having poor memory.  (Tr. 1416.)  He said his mood was "fine" and he did not really feel depressed, but noted that his family felt he seemed down.  (*Id*.)  He reported isolating at times, but he also reported spending time with his aunt and cousin.  (*Id*.)  He endorsed anhedonia and feelings of guilt at times.  (*Id*.)  He denied suicidal or homicidal ideation and denied hallucinations.  (*Id*.)  On examination, he made good eye contact, exhibited good hygiene, and was cooperative.  (Tr. 1414.)  He was alert and focused but presented as dysthymic with a constricted affect.  (*Id*.)  His speech was normal, his thought process was organized, and his associations and memory were intact.  (*Id*.)  His judgment was intact, his insight was fair, and his fund of knowledge was age appropriate.  (*Id*.)  Mr. Nagel reported no noticeable difference since starting Prozac.  (Tr. 1416.)  Prozac was discontinued and Mr. Nagel was started on Effexor.  (*Id*.)  Abilify and doxepin were continued.  (*Id*.)

On September 6, 2019, Mr. Nagel returned for follow up with APN Whitmer.  (Tr. 1418.)  His mental examination findings were similar to those from the prior month, except his mood

13

was euthymic rather than dysthymic and he had a mild impairment in judgment. (*Compare* Tr. 1421 *with* Tr. 1414.) He reported trouble sleeping and did not feel doxepin was helpful. (Tr. 1423.) He also reported no noticeable improvement since starting Effexor but preferred it over Prozac and reported feeling less tired. (*Id*.) He denied suicidal and homicidal ideation and denied hallucinations. (*Id*.) APN Whitmer recommended Remeron in place of doxepin. (*Id*.)

Mr. Nagel returned to jail for about two months following his September 2019 appointment. (Tr. 1429.) When he returned to APN Whitmer on December 19, 2019, he reported that he stopped taking Effexor while in jail because he had to walk too far to get it. (Tr. 1424, 1429.) He last took the medication in October and was interested in restarting. (*Id*.) He also reported that Remeron did not help with his sleep, and he had started taking an over-the-counter sleep medication. (*Id*.) Mental status examination findings were unchanged from his September 2019 visit. (*Compare* Tr. 1427 *with* Tr. 1421.) APN Whitmer prescribed Effexor again and recommended that he start a trial of hydroxyzine to help with his sleep. (Tr. 1429.)

When Mr. Nagel returned to APN Whitmer on February 5, 2020, he reported the new sleep medication was helping and he was doing well on Effexor. (Tr. 1436.) He also reported that his mood had "been good for the most part" with "some depression but not as often and more situational." (*Id*.) He reported that counseling was going well, and he was enjoying spending time with family. (*Id*.) His mental status examination findings were unchanged. (*Compare* Tr. 1434 *with* Tr. 1427.) His medications were continued, and his major depressive disorder and generalized anxiety disorder were noted to be improving. (Tr. 1436.)

On May 8, 2020, Mr. Nagel had a telehealth appointment with APN Whitmer. (Tr. 1437.) He reported doing well overall. (Tr. 1442.) He was cooperative, alert and focused, and euthymic. (Tr. 1440.) His speech was normal, his language, associations, and memory were

14

intact, and his thought process was organized.  (*Id*.)  He denied suicidal or homicidal ideation

and denied hallucinations.  (*Id*.)  His judgment was intact, and his insight was good.  (*Id*.)  His

medications were continued, and his major depressive disorder and generalized anxiety disorder

were noted to be stable.  (Tr. 1442.)

Mr. Nagel had another telehealth appointment with APN Whitmer on July 31, 2020.  (Tr.

1443.)  He reported his mood overall had been good, with some ups and downs.  (Tr. 1448.)  He

reported that he tried to distract himself when he found himself getting angry over little things.

(*Id*.)  He reported he started writing again to stay busy and was regularly going to his mom's

house to watch television.  (*Id*.)  His cat was keeping him company and his sleep was good.

(*Id*.)  His mental status examination findings were unchanged from the May 2020 appointment.

(*Compare* Tr. 1446 *with* Tr. 1440.)  His medications were continued, and his conditions were

noted to be stable.  (Tr. 1448.)

### 2. Opinion Evidence

### i. Physical Impairment Opinion Evidence

### a. Physical Functional Capacity Evaluation

Brett Balis, PT, DPT, a physical therapist with Cleveland Clinic Rehabilitation and

Sports Therapy completed a Physical Capacity Evaluation on September 30, 2020.  (Tr. 1036-37,

1040-49.)  PT Balis conducted the evaluation to determine Mr. Nagel's "tolerance to perform

work tasks."  (Tr. 1036, 1040.)  Based on his evaluation, PT Balis opined that:

> Mr. Nagel demonstrated the ability to perform within the LIGHT Physical Demand
> Category based on the definitions developed by the US Department of Labor and
> outlined in the Dictionary of Occupational Titles. Mr. Nagel is presently able to
> work part time for up to 5 hours and 31 minutes hours per day while taking into
> account his need to alternate sitting and standing.[] Mr. Nagel lifted 25 pounds to
> below waist height. Mr. Nagel lifted 15 pounds to shoulder height. Mr. Nagel

carried 20 pounds. Pushing abilities were evaluated and Mr. Nagel pulled 32 horizontal force pounds and pushed 32 horizontal force pounds respectively.

Non-material handling testing indicates Mr. Nagel demonstrates an occasional tolerance for Fine Coordination, Firm Grasping, Pinching, Squatting, Stair Climbing and Walking. Mr. Nagel demonstrated the ability to perform Above Shoulder Reach, Bending, Forward Reaching, Gross Coordination and Simple Grasping with frequent tolerance.

Musculoskeletal exam results as outlined in full Functional Capacity Evaluation report.

(Tr. 1040.)

### b.    State Agency Medical Consultants

State agency medical consultant Mehr Siddiqui, M.D. completed a physical RFC assessment on July 17, 2019 (Tr. 74-77, 88-91), opining that Mr. Nagel had the RFC to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk four hours in an eight-hour workday, sit about six hours in an eight-hour workday, frequently push and/or pull and operate hand controls with the right upper extremity, and occasionally operate foot controls with the right lower extremity (Tr. 75).  Dr. Siddiqui opined that Mr. Nagel had the following postural limitations: no climbing of ladders, ropes, and scaffolds; occasional stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; and frequent balancing.  (Tr. 75-76.)  Dr. Siddiqui explained that the postural limitations were due to abnormal gait and right-sided weakness.  (Tr. 76.)  Dr. Siddiqui also opined that Mr. Nagel was limited to frequent overhead reaching with the right upper extremity and should avoid all exposure to hazards such as heavy machinery and unprotected heights.  (Tr. 76-77.)

On reconsideration on November 28, 2019, state agency medical consultant Leon D. Hughes, M.D., adopted the Dr. Siddiqui's RFC findings.  (Tr. 109-12, 132-35.)

16

### ii.      Mental Health Impairment Opinion Evidence

### a.      Consultative Examination

On December 17, 2019, psychologist Herschel Pickholtz, Ed.D., conducted a clinical interview and mental status evaluation.  (Tr. 1025-34.)  Mr. Nagel presented with a slight limp, his nose was running, and he was dressed neatly and appropriately.  (Tr. 1029.)  When asked what prevented him from working, he said: "My right foot i[s] the problem and if not I would be working."  (Tr. 1026.)  Mr. Nagel's diagnoses included: unspecified depressive disorder, currently mild; unspecified mental disorder related to avoidant personality versus social phobia, mild; and alcohol use disorder, in sustained remission.  (Tr. 1033.)  Mr. Nagel reported he was not taking psychiatric medications, but had been attending counseling every week for about the last year and a half.  (Tr. 1027.)  Dr. Pickholtz concluded that Mr. Nagel's conditions "should improve" with his "current counseling and with future psychiatric medications."  (Tr. 1032-33.)  Dr. Pickholtz offered the following opinions regarding Mr. Nagel's functional limitations:

- his overall capacities to understand, remember, and carry out instructions for simple work activities and more complex work activities did not reflect any significant impairment;

- his capacities to perform one- to two-step tasks did not reflect any impairment and his overall capacities to perform three- to four-step tasks did not reflect any significant impairment;

- his capacities to relate to coworkers and others based upon his functioning in prison, presentation, work history, and description of current levels of social interaction suggested a slight impairment;

- his capacities to handle the stresses and pressures of work as a result of his current psychiatric complaints and conditions and based upon his daily activities are slightly to somewhat impaired at worst and would improve with future psychiatric medications as long as he continued with his counseling.

(Tr. 1033).

17

**b.      State Agency Psychological Consultants**

State agency psychological consultant Cindy Matyi, Ph.D. completed a psychiatric review technique (Tr. 72-73, 86-87) and mental RFC assessment (Tr. 77-79, 91-93) on July 9, 2019.  Dr. Matyi opined that Mr. Nagel had no more than moderate limitations in his ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 73, 77-79.)  Dr. Matyi further opined that given Mr. Nagel's limitations, he:

- could comprehend and remember simple (1-2 step) and occasional complex (3-5 step) instructions;

- could sustain concentration and persistence for tasks in a setting without demands for fast paced or high production;

- may benefit from a relatively isolated work-station and supervisory support when first learning job tasks;

- could relate adequately on a superficial basis in an environment with infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny; and

- could adapt to infrequent changes in a work setting.

(Tr. 77-79.)

State agency psychological consultant Ellen Rozenfeld, Psy.D., completed a psychiatric review technique (Tr. 106-08, 129-31) and mental RFC assessment (Tr. 112-14, 135-38) upon reconsideration on January 3, 2020, finding minimally less restrictive limitations than Dr. Mayyi found.  Dr. Rozenfeld opined that Mr. Nagel had no more than mild limitations in his ability to understand, remember, or apply information (Tr. 107, 112), whereas Dr. Matyi found no more than moderate limitations in that area (Tr. 73, 77).  Dr. Rozenfeld also changed Dr. Matyi's

18

limitation of infrequent contact with the public (Tr. 78) to no contact with the public (Tr. 113, 114) based on the consultative examiner's opinion that Mr. Nagel might have avoidant personality versus social phobia (Tr. 114).  Thus, Dr. Rozenfeld opined that given Mr. Nagel's limitations, he:

- could perform simple to complex tasks;

- could sustain concentration and persistence for tasks in a setting without demands for fast paced or high production;

- may benefit from a relatively isolated work-station and supervisory support when first learning job tasks;

- could relate adequately on a superficial basis in an environment with no public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny; and

- could adapt to infrequent changes in a work setting.

(Tr. 112-14.)

**C.    Hearing Testimony**

**1.    Plaintiff's Testimony**

At his October 14, 2020 hearing, Mr. Nagel testified in response to questioning by the ALJ and his representative.  (Tr. 38-57.)  He testified that he had not tried to get a job since 2017 because he spent almost two years going to doctors to try to figure out the problem with his right side and why he "really couldn't walk" or "really couldn't . . . grab anything . . . with [his] right hand."  (Tr. 42-43.)   He said his doctors were not certain what caused the problems with his fist and foot on the right side.  (Tr. 56.)  The only thing that they had relayed to him was that diagnostic testing showed the left-side of his brain was smaller than the right-side.  (*Id.*)

19

Mr. Nagel was asked to explain the problems with his right lower extremity and how it affected his ability to walk.  (Tr. 43, 45.)  He stated that his foot "turn[ed] in" on the inside, making it hard for him to walk.  (Tr. 43-44.)  His leg and foot stiffened or went numb at times, which caused him to drag his leg.  (Tr. 44, 49.)  His foot and toes were constantly numb and his toes curled in, which made it difficult for him to walk because it caused him to limp.  (Tr. 45.)  He had spasms in his leg and foot.  (Tr. 44, 49.)  The spasms in his foot occurred two or three times each day and lasted a couple of minutes each time.  (Tr. 49.)  His spams also disrupted his sleep.  (Tr. 51.)  He took a muscle relaxer that relieved his stiffness for a couple of hours and helped him walk.  (Tr. 50.)  The muscle relaxer did not help with his spasms.  (*Id*.)  Elevating his foot helped with the numbness and spasms, and lying down was the most comfortable position for him.  (Tr. 49.)  He could sit for about a half an hour and then had to lie back down.  (*Id*.)  He used a walker around his house because it was hard for him "to get up and just to walk, even to the kitchen."  (Tr. 44.)  He also used a brace for his leg which he described as a plastic boot that helped straighten his foot out and helped him walk.  (*Id*.)  He estimated being able to walk for about twenty-five or thirty minutes before getting winded and needing to sit down and rest before he could walk again.  (Tr. 44-45.)  He also reported he used a shower bench because he could not stand for long periods.  (Tr. 46.)

Mr. Nagel also discussed the problems he had with his right non-dominant hand.  (Tr. 45, 51-52.)  He stated: "It looks more like my thumb like kind of goes in, like it's -- it looks like I'm making a fist, but I'm not really making a fist, it's my thumb that's going in, and it's like kind of hard for me to like grab stuff."  (Tr. 45-46.)  He explained that if he grabbed anything with his right hand, he had to make sure that he grabbed it slowly to make sure his fingers were completely grasping the object before picking it up.  (Tr. 46, 51-52.)  If he used his right hand to

20

pick something up, he had to switch it to his left hand to avoid dropping it.  (*Id*.)  He explained it was difficult for him to shower using both his hands and as a result it took him longer to shower. (Tr. 46-47.)  Cooking also took him a long time because of the problems with his right hand. (Tr. 47.)  As a result, he usually just fixed microwaveable meals.  (*Id*.)  His mom helped him with his laundry, and it was difficult for him to do dishes.  (*Id*.)  He was unable to type, text, or play video games with his right hand.  (Tr. 52.)

Mr. Nagel also testified about his mental health conditions, stating he suffered from depression, loneliness, and anxiety.  (Tr. 52-53.)  He received treatment at Signature Health.  (Tr. 53.)  He was seeing a therapist every two weeks and seeing a psychiatrist for medication management every five or six weeks.  (*Id*.)  He was taking Effexor, which he said helped somewhat, but he was still depressed.  (*Id*.)

Mr. Nagel lived alone.  (Tr. 54.)  He did not have a driver's license.  (Tr. 48, 55.)  He had a temporary driver's license at one point, but was never motivated to obtain a permanent driver's license.  (*Id*.)  His family drove him places or he used Paratransit to get to medical appointments. (*Id*.)  He visited with family.  (*Id*.)  He typically spent his day watching television or movies or listening to music.  (Tr. 54.)  He also tried to do home exercises for his leg and foot.  (Tr. 55.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 57-66.)   He classified Mr. Nagel's past work as a combination job that included tray attendant and dishwasher.  (Tr. 58.) Both jobs were unskilled and normally performed at the medium exertional level.  (Tr. 58-59.)

The VE testified that a hypothetical individual with Mr. Nagel's past jobs and the function limitations described in the ALJ's RFC determination could not perform his past work, but could perform representative positions in the national economy, including addresser,

21

document preparer, and table worker.  (Tr. 58-61.)  The VE testified that missing more than two

days a month or being off-task 20% or more of the day would be work preclusive.  (Tr. 62-64.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  Disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must
be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a
severe impairment that has lasted or is expected to last for a continuous
period of at least twelve months, and his impairment meets or equals a listed
impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must
assess the claimant's residual functional capacity and use it to determine if
the claimant's impairment prevents him from doing past relevant work.  If
the claimant's impairment does not prevent him from doing his past relevant
work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy. *Id.*

## IV.    The ALJ's Decision

Below is a summary of the findings made by the ALJ in his November 24, 2020 decision:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2013. (Tr. 17.)

2. The claimant has not engaged in substantial gainful activity since November 30, 2012, the alleged onset date. (*Id*.)

3. The claimant has the following severe impairments: right hemiparesis with spasticity, anxiety, and depression. (Tr. 18.)

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments, including Listings 11.17 (neurodegenerative disorders of the central nervous system), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders). (Tr. 18-19.)

5. The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except standing and walking for four hours in an eight-hour day; frequent push/pull with the right upper

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

extremity; occasional right foot controls; the claimant can occasionally use ramps and stairs but can never use ladders, ropes or scaffolds; the claimant can frequently balance, occasionally kneel, stoop, crouch and crawl; the claimant is limited to frequent handling and fingering with the non-dominant hand; claimant is restricted from hazards such as heights or machinery but is able to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar or approaching people or vehicles; limited to occasional interaction with a small group of coworkers where the contact is casual in nature, no interaction with the public; and the claimant is limited to a static work environment, tolerating few changes in a routine work setting and when said changes do occur, any changes in job duties will be explained.  (Tr. 20-23.)

6. The claimant is unable to perform any past relevant work. (Tr. 23.)

7. The claimant was born in 1981.  (*Id.*)  He was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.*)

8. The claimant has obtained his GED.  (*Id.*)

9. Transferability of job skills is not material to the determination of disability because claimant's past relevant work is unskilled.  (Tr. 24.)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that he can perform such as addresser, document preparer, and table worker.  (Tr. 24-25.)

Based on the foregoing, the ALJ determined that Mr. Nagel had not been under a disability from November 30, 2012 through the date of the decision.  (Tr. 25.)

## V.   Plaintiff's Arguments[3]

Mr. Nagel argues that the ALJ erred by failing to find that the combination of his symptoms precluded him from engaging in substantial gainful activity on a full-time sustained basis.  (ECF Doc. 9, pp. 1, 12-21; ECF Doc. 14, pp. 1-2.)  He also argues that the ALJ erred in

---

[3] Mr. Nagel also argued that the Commissioner lacked the constitutional authority to decide his case.  (ECF Doc. 9, pp. 1, 9-12; ECF Doc. 14, pp. 3-9.)  Since briefing the issue, Mr. Nagel abandoned this argument.  (*See* ECF Doc. 15 (Notice of Narrowed Issues).)  Accordingly, his constitutional argument is not addressed.

his evaluation of the September 2020 physical capacity evaluation.  (ECF Doc. 9, pp. 1, 21-24; ECF Doc. 14, pp. 2-3.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: Whether Certain Findings Lacked the Support of Substantial Evidence**

As it pertains to Mr. Nagel's first assignment of error, the undersigned has determined that the following issues were sufficiently identified or argued to warrant consideration: (1) whether the ALJ erred in concluding that Mr. Nagel's impairments did not satisfy the criteria of Listing 11.17 (ECF Doc. 9, pp. 13-17; ECF Doc. 14, pp. 1-2); (2) whether the ALJ erred in finding that Mr. Nagel had no more than moderate limitations in the four categories of mental functioning (ECF Doc. 9, pp. 13,18-19); and (3) whether the ALJ failed to consider the combined effects of Mr. Nagel's impairments and build a logical bridge between the evidence and his finding that Mr. Nagel was not disabled (ECF Doc. 9, pp. 19-20). Each of these arguments will be addressed in turn below.

26

To the extent that Mr. Nagel intended to assert other issues in this appeal, the undersigned finds that they were raised in a perfunctory manner, without developed or clearly articulated argument, and are therefore deemed waived. *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.").

### 1.    Whether ALJ Erred in Analysis of Listing 11.17

Mr. Nagel argues that the ALJ erred in evaluating the evidence to support his finding that Mr. Nagel's impairments did not satisfy Listing 11.17. (ECF Doc. 9, pp. 13-17.) He argues the "faulty analysis of Listing 11.17 was limited to adopting the decisions by the State Agency in July and November 2019" (*id.* at p. 14) and that the ALJ "failed to discuss any of the relevant evidence" concerning his hemiparesis and spasticity (*id.* at 14-16).

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that his condition meets or equals a Listing. *Johnson v. Colvin*, No. 1:13CV-00134-HBB, 2014 WL 1418142, at *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)). To meet that burden, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 728 (6th Cir. 2004).

Listing 11.17 deals with neurodegenerative disorders of the central nervous system. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.17. To satisfy Listing 11.17, a claimant must show:

A.  Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.

OR

B.  Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:

1.  Understanding, remembering, or applying information (see 11.00G3b(i)); or
2.  Interacting with others (see 11.00G3b(ii)); or
3.  Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
4.  Adapting or managing oneself (see 11.00G3b(iv).

*Id.* Disorganization of motor function means: "interference, due to your neurological disorder, with movement of two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders)." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.11D(1). "[T]wo extremities . . . mean[s] both lower extremities, or both upper extremities, or one upper extremity and one lower extremity." *Id.*

An "extreme" limitation is an "inability to stand up from a seated position, maintain balance in a standing position and while walking, or use . . . upper extremities to independently initiate, sustain, and complete work-related activities." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.00D(2). Specifically, an inability to stand or maintain balance requires an inability to do so "without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.00D(2)(a)-(b). An inability to use the upper extremities means "a loss of function in <u>both</u> upper extremities . . . that very seriously limits [the] ability to" perform activities "involving find and gross motor movements." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.00D(2)(c) (emphasis added).

A "marked" limitation in physical functioning includes when a neurological disease process causes symptoms that affect the ability to "independently initiate, sustain, and complete

28

work-related activities, such as standing, balancing, walking, using both upper extremities for fine and gross movements, or results in limitations in using one upper and one lower extremity." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.00G(2)(a).  The symptoms "must result in a serious limitation in [the] ability to do a task or activity on a sustained basis."  *Id.*

At Step Three, the ALJ specifically considered Listing 11.17 and concluded that Mr. Nagel's did not satisfy the listing.  (Tr. 18.)  In support of this conclusion, he found:

> No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. The record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitation required to meet or equal the criteria of any listed impairment and no acceptable medical source designated to make equivalency findings has concluded that the claimant's impairment(s) medically equal a listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meets or medically equals a listed impairment, the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process were also considered and reached the same conclusion [].

(Tr. 18 (citation omitted).)

In challenging this finding, Mr. Nagel argues first that the ALJ erred because his analysis "was limited to adopting the decisions by the State Agency in July and November 2019."  (ECF Doc. 9, p. 14.)  Even a cursory review of the ALJ's findings reveals that he based his decision on the objective medical evidence, the lack of medical opinion findings indicating Mr. Nagel met or equaled any listing, <u>and</u> the findings of the state agency medical consultants.  (Tr. 18.)  Mr. Nagel also suggests that the state agency opinions themselves were improperly "based on retained strength and the fact that [Mr.] Nagel was ambulatory," when the medical records actually documented "reduced strength and abnormal reflexes on the right."  (ECF Doc. 9, p. 14.) However, the records show that Drs. Siddiqui and Hughes considered records showing "spasms and reduced strength" in the right lower extremity and a spastic and hemiparetic gait on the right

29

(Tr. 71, 74, 104, 109) in addition to findings of "retained 5/5 strength" in the upper extremities and left lower extremity and an ability to ambulate with an AFO brace (Tr. 74, 108).  The record also does not support Mr. Nagel's argument that "[t]he ALJ erroneously concluded" that 2+ reflexes in the bilateral left extremities and 3+ reflexes in the right were "normal."  (ECF Doc. 9, p. 14.)  In fact, the ALJ found the evidence showed Mr. Nagel's "reflexes [were] normal <u>or</u> 3+ in the right and lower extremities" (Tr. 21 (emphasis added)), which was consistent with the record (*see, e.g.,* Tr. 999, 1064).

Mr. Nagel next argues that the ALJ "failed to discuss any of the relevant evidence in this matter," including specifically identified evidence such as: 2017 and 2020 MRI results; physical and occupational therapy examination findings 2018, 2019, and 2020; observations of right spastic hemiparesis and an abnormal gait in 2019, with a notation that Botox was not helping leg spasticity; and observations of problems holding on to objects with the right hand, and the need to use braces to walk in 2020.  (ECF Doc. 9, pp. 14-16.)  However, a review of the decision reveals that the ALJ explicitly considered much of the evidence that Mr. Nagel contends was ignored, including his MRI findings, evidence relating to his right hemiparesis with spasticity, reports that Botox did not help with spasticity, evidence of an unsteady gait and his need to use a cane at times, and his use of an AFO brace for ambulation.  (*Compare* Tr. 20-21 *with* ECF Doc. 9, pp. 14-16.)  The ALJ was not required to discuss the details of every treatment record, so long as his decision reflected that he considered the evidence as a whole and reached a reasoned conclusion.  *See Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam).  Mr. Nagel's general recitation of evidentiary findings – many of which were discussed by the ALJ – is insufficient to demonstrate that the ALJ failed to adequately consider the relevant evidence.

30

Importantly, the burden rests with Mr. Nagel at Step Three to show that his impairments meet or equal Listing 11.17. Mr. Nagel argues broadly that "his functional limitations were sufficient to establish disability" in this case, citing generally to physical and occupational therapy records showing reduced strength and reflexes and specifically to a 2018 physical therapy record where he reported functional limitations in rising from a chair, walking, climbing stairs, and other activities. (ECF Doc. 9, p. 16 (citing Tr. 744).) But the examination findings from the record he cites show no more than a mild impairment in gait, an ability to stand from a seated position without using his hands, an ability to stand and stabilize independently, with no indication he required a walker, two crutches, or two canes to stand or walk. (Tr. 744-45.) The other therapy records he generally references fare no better in establishing that the significant requirements of Listing 11.17 have been met in this case.

For the reasons set forth above, the Court finds that the ALJ's Step Three finding that Mr. Nagel's impairments did not satisfy Listing 11.17 was supported by substantial evidence, and that Mr. Nagel has not met his burden to establish otherwise.

### 2. Whether ALJ Erred in Finding Mental Impairments Did Not Cause More than Moderate Limitations in the Four Categories of Mental Functioning

Mr. Nagel next argues that the ALJ erred at Step Three when he found Mr. Nagel had no more than moderate limitations in the four categories of mental functioning, and therefore did not satisfy the criteria of Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety disorders). (ECF Doc. 9, pp. 13, 18-19.)) As noted above, Mr. Nagel bears the burden of establishing that his condition meets or equals a Listing, *Johnson*, 2014 WL 1418142, at *3, and "must present specific medical findings that satisfy the various tests listed in the description

31

of the applicable impairment or present medical evidence which describes how the impairment has such equivalency" *Thacker*, 93 Fed. App'x at 728.

Listings 12.04 and 12.06 deal with depressive, bipolar and related disorders (12.04) and anxiety and obsessive-compulsive disorders (12.06). 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.04, 12.06.) Both of these Listings incorporate identical paragraph B and paragraph C criteria, which is an analysis used to rate the severity of mental impairments in four general areas of functioning at Steps Two and Three of the sequential evaluation process. 20 C.F.R. §§ Pts. 404, 416. Paragraph B defines four broad mental functional areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself," and requires that a claimant show extreme limitation in one area, or marked limitation in two areas in order to meet a listing. 20 C.F.R. § 404.1520a(c)(3), *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00E. As Mr. Nagel's argument is focused on the "B" criteria, those are the criteria that will be addressed herein.

Mr. Nagel contends that the ALJ erred in finding he had moderate limitations in the four categories of mental functioning, including his ability to: understand, remember or apply information; interact with others; concentrate, persist or maintain pace; and adapt or manage himself. (ECF Doc. 9, pp. 18-19.) More specifically, he argues that the ALJ's reliance on the opinion of Dr. Pickholtz to support his finding of moderate limitations was error, and that the ALJ should have found that the treatment records showed he was seriously limited (*id.*), the equivalent of a marked limitation. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00F(2)(d).

Notably, the inquiry required here is whether the ALJ's findings were supported by substantial evidence, not whether the evidence could possibly support greater impairment. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited

substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

The ALJ in this case provided a detailed analysis in support of his findings regarding Mr. Nagel's level of limitation in each of the "B" criteria functional areas, with citations to specific evidentiary support for each finding, as follows:

> In understanding, remembering or applying information, the claimant has a moderate limitation. The evidence indicates that the claimant underwent a consultative psychological examination performed by Herschel Pickholtz, Ed.D. dated December 17, 2019 and he concluded that the claimant's intellectual functioning is in the upper end of the low average to average range []. Other evidence in the record also notes average intellectual functioning and average fund of knowledge []. However, the claimant has alleged some memory issues and the claimant's mother reported that the claimant sometimes has trouble finding the right words []. Dr. Pickholtz concluded that the claimant's overall capacities to understand, remember and carry out instructions for simple and more complex work activities did not reflect any significant impairment [].
>
> In interacting with others, the claimant has a moderate limitation. Mental status exams note that the claimant is cooperative and friendly []. The evidence indicates that the claimant visits with his mother and other relatives. However, he does not have friends, avoids social contacts, and struggles with social isolation []. The evidence also notes episodes of anger and irritability at times [].
>
> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. Mental status exams in the record from Signature Health note fair attention and concentration []. At the consultative exam performed by Dr. Pickholtz, he noted that the claimant's capacities for attention and concentration based upon recall of digits forwards and backwards and solving mathematical computation problems fell in the average to low average range. He indicated that the claimant's pace was fairly unremarkable but persistence appeared to be variable. Dr. Pickholtz concluded that the claimant's capacities to perform one to two step tasks did not reflect any impairment and his capacities to perform three to four step tasks did not reflect any significant impairment [].
>
> As for adapting or managing oneself, the claimant has experienced a moderate limitation. The evidence establishes that the claimant is well groomed with good

hygiene. Judgment has been noted to be mildly impaired at times but on other occasions, it has been noted to be fair or intact. Insight has been noted to be fair to good []. However, the evidence indicates that the claimant was in prison from 2008 to 2017 []. There is also evidence of passive suicidal thoughts with two suicide attempts in the past []. At the consultative exam, Dr. Pickholtz concluded that the claimant has a slight to somewhat impaired ability to handle the stresses or pressures of work [].

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 18-19 (citations omitted).)

Mr. Nagel argues that the ALJ erred in relying on the one-time examination of Dr. Pickholtz because Dr. Pickholtz "failed to consider the evidence from Signature Health or [Mr.] Nagel's two hospitalizations at Highland Springs." (ECF Doc. 9, p. 19.) He further argues that the treatment records were inconsistent with Dr. Pickholtz' opinion, and "demonstrated that [Mr.] Nagel was seriously limited in his ability to function independently, appropriately, effectively, and on a sustained basis." (*Id.*) As with Mr. Nagel's argument in section VI.B.1., *supra*, even a cursory review of the ALJ's decision shows that he based his assessment of Mr. Nagel's mental functioning on more than Dr. Pickholtz' examination. (Tr. 18-19.) For example, the ALJ discussed and cited to records regarding Mr. Nagel's history of suicide attempts, including records from his February 2019 partial hospitalization. (Tr. 18 (citing Exhibit 2F, pp. 6, 7, 11 (Tr. 608-09, 613)).) He also cited to multiple treatment records from Exhibits 6F and 13F, which are all Signature Health treatment records. (Tr. 18-19.)

In further discussion of the medical evidence at Step Four, the ALJ specifically discussed Mr. Nagel's partial hospitalizations at Highland Springs. (Tr. 21.) After noting that Mr. Nagel was treated at Signature Health for anxiety and depression, the ALJ stated:

He also was in the partial hospitalization program at Highland Springs in February 2019 with diagnoses of mood disorder, NOS and R/O bipolar II, mixed, severe

without psychotic features and again in May 2019 with diagnoses of major depressive disorder, recurrent, severe without psychotic features and anxiety disorder, NOS [].

(*Id.* (citations omitted).)  The ALJ also provided further details from the Signature Health medical records regarding Mr. Nagel's symptoms and examination findings, explaining:

> The evidence indicates that the claimant has symptoms that include sleep difficulties, irritability, low self-esteem, social isolation, and passive suicidal thoughts. He also ruminates about his father and his father's death. There is also evidence of a generalized apathy or anhedonia []. Nevertheless, mental status exams in the record have generally been normal. The claimant is noted to be well oriented x 4, is friendly and cooperative, is well groomed with good eye contact, has normal speech, intact or reality based associations, linear and goal directed thought processes, and fair attention and concentration []. Furthermore, Signature Health records have consistently noted that the claimant is doing well with good or stable mood [].

(*Id.* (citations omitted).)  He also considered treatment modalities used to manage Mr. Nagel's mental health conditions, including counseling and medication.  (*Id.*)  He also considered and relied on other opinion evidence, including the opinions of the state agency psychological consultants who found no more than moderate impairments in Mr. Nagel's mental functional abilities.  (Tr. 18, 22, 72-73, 86-87, 77-79, 91-93, 106-08, 112-14, 129-31, 135-38.)

The Court therefore finds no merit to Mr. Nagel's argument that the ALJ failed to consider the full evidentiary record in support of his finding that Mr. Nagel had no more than moderate limitations in mental functioning.  The ALJ considered Dr. Pickholtz' opinion in conjunction with other evidence relevant to Mr. Nagel's mental functional abilities, including his mental health treatment, subjective symptoms reports, and other opinion evidence.  (Tr. 18-22.) The ALJ was not required to discuss the details of every treatment record so long as his decision reflected that he considered the evidence as a whole and reached a reasoned conclusion.  *See Boseley.*, 397 F. App'x at 199.  Mr. Nagel's generalized arguments fail to specifically identify

the evidence the ALJ neglected to consider, and further fail to explain how the consideration of such evidence would have necessitated a finding that Mr. Nagel had marked limitations in any specific category of mental functioning.

For the reasons set forth above, the Court finds that the ALJ's Step Three findings regarding Listings 12.04 and 12.06 were supported by substantial evidence, and that Mr. Nagel has not met his burden to establish otherwise.

### 3. Whether ALJ Failed to Consider Combined Effects of Impairments

Mr. Nagel argues that the ALJ erred because he "clearly did not consider the effect of the combination of [his] impairments" and "erroneously did not build an accurate and logical bridge between the evidence documenting [his] disabling problems and the ALJ's decision to deny benefits." (ECF Doc. 9, pp. 20-21.)  His argument is cursory and lacking in substance, and a review of the decision and applicable law make clear that the argument must fail.

"In the Sixth Circuit, courts have held that 'an ALJ's finding that a claimant's combination of impairments (plural) did not meet or equal the Listings is sufficient to show that the ALJ had considered the effect of the combination of impairments,' so long as the ALJ has 'conducted sufficient analyses of each of the claimants' impairments after carefully considering the entire record.'" *Malave v. Saul*, No. 1:18-CV-2747, 2019 WL 5552614, at *13 (N.D. Ohio Oct. 22, 2019), *report and recommendation adopted*, No. 1:18CV2747, 2019 WL 5552613 (N.D. Ohio Oct. 28, 2019) (quoting *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 789 (N.D. Ohio 2002), *citing Gooch v. Sec'y of Health and Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987); *Loy v. Sec'y of Health and Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990)) (finding ALJ adequately considered combined effect of impairments; reversing on other grounds).)

36

Here, the ALJ stated that Mr. Nagel "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (Tr. 18.)  In reaching this finding, the ALJ analyzed Mr. Nagel's impairments under multiple listings. (*Id.* (evaluating Mr. Nagel's multiple impairment under Listings 11.17, 12.04, and 12.06).)  Mr. Nagel has not shown that the ALJ's discussion at Step Three or in the balance of the decision was insufficient.  His disagreement with the ALJ's findings is not a basis for reversal or remand because the decision makes it clear that the ALJ considered the combined effects of Mr. Nagel's impairments.  *See e.g., Malave*, 2019 WL 5552614, * 13 ("The standard of review in this area is deferential, and the ALJ's statements that he considered the combination of Malave's impairments, combined with his detailed assessment of the individual impairments in the opinion, constitute an adequate consideration of the effect of Malave's combined impairments.).

Furthermore, "'[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  Here, the ALJ considered and evaluated the subjective symptoms, treatment records, opinion evidence, and other evidence in finding that Mr. Nagel's impairments were not as disabling as alleged.  The decision allows for meaningful review and does not lack a logical bridge between the evidence and the decision.

For the reasons set forth above, the undersigned finds that Mr. Nagel has not met his burden to demonstrate that the ALJ failed to consider the combined effects of his impairments, and has not shown that the ALJ's decision lacks the support of substantial evidence.

**C.      Second Assignment of Error: Whether ALJ Properly Considered PT Opinion**

In his second assignment of error, Mr. Nagel challenges the ALJ's evaluation of the physical capacity evaluation completed by physical therapist Brett Balis.  (ECF Doc. 9, pp. 21-24; ECF Doc. 14, pp. 2-3.)  In particular, he argues that the ALJ "failed to provide a coherent explanation or any rationale for his determination" that PT Balis' opinion was persuasive as to Mr. Nagel's ability to perform light work, climb stairs, and squat, but not as to his need to be limited to part time work with sitting and standing limitations.  (ECF Doc. 9, p. 22.)  Instead, Mr. Nagel asserts that the ALJ should have found the opinion fully persuasive and incorporated PT Balis' opinion that Mr. Nagel could only perform part-time work into the RFC.

The Social Security Administration's ("SSA") regulations governing the evaluation of medical opinions in claims filed after March 27, 2017 provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation." *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky. March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)).  The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency acknowledged to be the most important factors for consideration.  20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2).  An ALJ must explain how consistency and supportability were considered.  20 C.F.R. § 404.1520c(b)(2).  He "may, but [is] not required to, explain how [he] considered the [other] factors."  *Id.*

Here, the ALJ analyzed the persuasiveness of PT Balis' opinion as follows:

The functional capacity evaluation performed by Brett Balis, PT, DPT dated September 30, 2020 is persuasive in that he noted that the claimant has a functional capacity for light work, can lift up to 25 pounds, carry up to 20 pounds, and can

38

perform occasional stair climbing and occasional squatting, which is consistent with the overall evidence in the record. However, he further concluded that the claimant was limited to working only part time for up to five hours and 31 minutes while taking into account his need to alternate between sitting and standing and can sit for a total of three hours and 21 minutes and one hour at a time and stand for a total of two hours and 32 minutes and 30 minutes at one time <u>but the overall evidence in the record as set forth above does not establish that the claimant can only work part time or have such limitations with sitting and standing. Moreover, this opinion was based on a one-time visit. In addition, Mr. Balis is not an acceptable medical source</u> per 20 CFR 404.1513 and 416.913 and POMS DI 22505.003 (Exhibits 10, 11F).

(Tr. 22-23 (emphasis added).)  Thus, the ALJ found PT Balis' limitations to part time work with limited sitting and standing less persuasive because they were not consistent with the other evidence of record, and were based on a one-time visit with a provider who is not an "acceptable medical source."  (*Id.*)  Mr. Nagel's broad argument that the ALJ "failed to provide a coherent explanation or any rationale for his determination" is thus without merit.  (ECF Doc. 9, p. 22.)

Mr. Nagel also argues that the ALJ should have treated PT Balis' opinion as a treating source opinion by an "acceptable medical source" because PT Balis' evaluation was requested by Mr. Nagel's treating physician.  (ECF Doc. 9, pp. 22-23; ECF Doc. 14, pp. 2-3.)[4]  In *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546 (6th Cir. 2020), the Sixth Circuit found a functional capacity examination ("FCE") by a physical therapist was a treating source opinion because the treating physician had referred the plaintiff for the FCE <u>and</u> had "signed off on the results of the FCE."  *Id.* at 553.  There, the court was addressing the question whether a treating doctor's co-signature on an FCE could serve to convert that FCE into a treating source opinion.  *Id.* at 552-53.  Here, Mr. Nagel acknowledges that his treating doctor did not sign PT Balis' evaluation.

---

[4] Mr. Nagel's arguments based on case law applying the treating physician rule and "good reason" standard are in error.  (ECF Doc. 9, pp. 23-24.)  That rule is not applicable to his case because Mr. Nagel's applications for social security benefits were filed in 2019.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

(ECF Doc. 9, p. 23.)  Thus, the ALJ did not err in observing that PT Balis is not an acceptable medical source, or in considering that fact in assessing the persuasiveness of his opinion.

Mr. Nagel also argues that it was error for the ALJ to consider the fact that PT Balis' opinion was based on a one-time visit because the ALJ had found a different opinion based on a one-time visit – by Dr. Pickholtz – to be persuasive.  (ECF Doc. 9, p. 23.)  The regulations call for ALJs to consider the length and nature of treating relationships in assessing the persuasiveness of medical opinion evidence.  20 C.F.R. § 404.1520c(c)(3).  But that consideration is just one of the factors ALJs are required to consider in assessing persuasiveness.  20 C.F.R. § 404.1520c(c)(1)-(5).  It was not error for the ALJ to consider the fact that PT Balis' evaluation was based on a one-time visit in assessing the opinion's persuasiveness.  Likewise, it was neither inconsistent nor error for the ALJ to separately conclude that another provider's one-time evaluation was persuasive.

Finally, Mr. Nagel argues the ALJ erred because he did not "cite to any contemporaneous medical evidence" to support his persuasiveness finding and "summarized almost 1500 pages of medical records into 2 paragraphs of analysis in approximately one page of the decision."  (ECF Doc. 9, p. 23; ECF Doc. 14, p. 2.)  Despite raising this criticism, Mr. Nagel does not specifically identify evidence from that "almost 1500 pages of medical records" that would require this Court to find the ALJ mischaracterized the evidence, failed to address material evidence, or otherwise lacked substantial evidence to support his persuasiveness finding.  The ALJ clearly considered Mr. Nagel's history of right hemiparesis with spasticity and limitations relating to his physical impairments in reaching his decision in the case.  (Tr. 18, 20-21.)  He was not required to discuss the details of every treatment record, so long as his decision reflected that he considered the evidence as a whole and reached a reasoned conclusion.  *See Boseley.*, 397 F. App'x at 199.

40

Neither was he required to restate previously discussed evidentiary findings in support of his persuasiveness finding. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016); *Flanary v. Saul*, No. 6:20-CV-00189-CHB, 2021 WL 5577798, at *6 (E.D. Ky. Nov. 29, 2021); *Merrell v. Comm'r of Soc. Sec.*, No. 1:20-CV-769, 2021 WL 1222667, at *7 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted,* No. 1:20 CV 769, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021).  Mr. Nagel's cursory argument that the ALJ erred in identifying the evidence supporting his persuasiveness finding is inadequately articulated and must fail.

While Mr. Nagel argues the ALJ should have reached a different conclusion, the Court finds the record supports a finding that substantial evidence supported the ALJ's findings as to the persuasiveness of PT Balis' opinion. *See Blakely*, 581 F.3d at 406 ("'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" (internal citation omitted)).

For the reasons explained herein, the Court finds that the ALJ did not err in his evaluation of PT Balis' opinion, and Mr. Nagel has failed to demonstrate that the ALJ's decision lacked the support of substantial evidence.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

September 20, 2023

*/s/ Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

41